USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ___________
DATE FILED: 8/31/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MATTHEW AUSTIN,

Plaintiff,

-v-

TD SECURITIES (USA) LLC,

Defendant.

**ORDER**

25-CV-7866 (DEH) (HJR)

**HENRY J. RICARDO, United States Magistrate Judge:**

Plaintiff Matthew Austin ("Plaintiff" or "Austin") brings this action against his former employer, Defendant TD Securities (USA) LLC ("TDS" or "Defendant"), seeking a declaratory judgment that the Non-Compete Agreement he signed is unenforceable, void, or inapplicable, and asserting claims for breach of the implied covenant of good faith and fair dealing and tortious interference. ECF No. 16. TDS moves to compel arbitration and to stay the case, ECF No. 17, contending that Austin must pursue his claims in arbitration before the Financial Industry Regulatory Authority ("FINRA"). ECF No. 19 at 7. For the reasons described below, the motion is **GRANTED**.

## I. BACKGROUND

### A. Factual and Procedural Background

Austin began working at TDS as a Director in the Automated Trading Research & Development group on February 20, 2024. ECF No. 21 at 6; ECF No. 22-1 at 2. As a condition of his employment, Austin signed a Non-Compete, Non-Solicitation, and Intellectual Property Agreement on May 24, 2023 (the "Non-

Compete"). ECF No. 16 at 5; ECF No. 22-2 at 10. The Non-Compete included a forum selection clause providing that any litigation relating to the agreement was subject to the "exclusive jurisdiction of those state and federal courts having jurisdiction in New York County, New York." ECF No. 22-2 at 8.

While working at TDS, Austin registered with FINRA, the nongovernmental regulator that oversees brokerage firms. ECF No. 21 at 5; ECF No. 20-1 at 15. As part of the registration process, Plaintiff signed a Form U4 Application for Securities Industry Registration or Transfer (the "U4"). ECF No. 21 at 5. The U4 requires each registrant to identify the firm with which he or she wishes to register. *Id.*; ECF No. 20-1 at 2. Instead of identifying TDS, Austin listed one of TDS's subsidiaries, TD Securities Automated Trading, LLC, which is now known as TD Financial Products LLC ("TDFP"). ECF No. 20-1 at 2; ECF No. 19 at 7. Although they share common ownership, TDFP and TDS are separately registered broker-dealers and are both FINRA "Members." ECF Nos. 21 at 13–14, 29 at 11. The U4 contains a mandatory arbitration clause covering disputes between the registrant and the firm identified in the registration. ECF No. 20-1 at 14. This clause also binds the parties to FINRA's rules, which require arbitration of disputes with any FINRA Member regarding their business activities. *Id.* The U4 form was filed on February 21, 2024, nearly one year after Austin signed the Non-Compete with TDS. See ECF Nos. 20-1 at 15, 22-2 at 10.

Austin resigned from TDS on August 25, 2025. ECF No. 16 at 2. On September 22, 2025, he sued to void the Non-Compete in this Court, which is one of

the courts described in the forum selection clause of the Non-Compete. ECF No. 1. Austin filed a First Amended Complaint (the "FAC") on November 25, 2025. ECF No. 16. The FAC seeks a declaratory judgment that the Non-Compete is unenforceable, void, or otherwise inapplicable, and includes claims for breach of the implied covenant of good faith and fair dealing and for tortious interference. FAC at 12–15.

TDS moved to compel arbitration and to stay this case on December 9, 2025, contending that Austin's subsequent agreement to arbitrate in the U4 applies to the claims asserted in this suit. ECF Nos. 17, 19–20. Plaintiff opposed the motion on December 18, 2025. ECF Nos. 21–22. Defendant filed its reply on January 2, 2026. ECF Nos. 29–30. With the Court's permission, Plaintiff filed a sur-reply on January 12, 2026 to address arguments Defendant only raised in its reply. ECF No. 36.[1]

## II. LEGAL STANDARDS

The Federal Arbitration Act ("FAA") provides that an agreement to arbitrate disputes is valid "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Courts consider four factors when evaluating whether parties are bound to arbitrate: "(1) whether the parties agreed to arbitrate; (2) the scope of the arbitration agreement; (3) whether the plaintiff's . . . claims are nonarbitrable; and (4) if some, but not all of the claims in the case are

[1] Several of the key issues discussed below were only addressed in detail in the reply and sur-reply. Defendant's opening brief largely glossed over the fact that TDS is seeking to enforce an arbitration agreement it did not sign, and Plaintiff's opposition brief failed to address the standard that applies when a non-signatory seeks to enforce an arbitration agreement against a signatory.

arbitrable, whether to stay the balance of the proceedings pending arbitration." *Abdullayeva v. Attending Homecare Servs. LLC*, 928 F.3d 218, 221–22 (2d Cir. 2019) (internal citation omitted). Courts deciding motions to compel arbitration apply a "standard similar to that applicable for a motion for summary judgment." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003). "[C]ourts may therefore consider materials outside the complaint, including the arbitration agreement itself." *Alfonso v. Maggies Paratransit Corp.*, 203 F. Supp. 3d 244, 247 (E.D.N.Y. 2016).

## III. DISCUSSION

Arbitration is a matter of contract, and a party cannot be required to submit to arbitration any dispute it has not agreed to arbitrate. *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 126 (2d Cir. 2010). Austin does not deny that he entered into a valid agreement to arbitrate with TDFP by signing the U4, but he argues that he did not agree to arbitrate this dispute with TDS regarding the enforceability of the Non-Compete. *See* ECF Nos. 20 at 2, 21 at 11. The issues raised by this motion are: (1) whether *TDS* can enforce the arbitration agreement despite being a non-signatory; (2) assuming that TDS can enforce the arbitration agreement, whether the parties delegated to the arbitrator authority to determine whether this dispute is arbitrable; and (3) assuming that the Court, not an arbitrator, must determine the arbitrability of this dispute, whether this dispute must be referred to arbitration. As described below, the undersigned answers these questions yes, no, and yes, and this action is hereby stayed pending arbitration.

### A. TDS Can Enforce the U4's Arbitration Clause

The first question posed by this motion is whether TDS, which is not a signatory to the U4, can rely on that agreement to compel arbitration with Austin. The Second Circuit has developed a two-pronged test to determine when a signatory to an arbitration agreement (here, Austin) is equitably estopped from avoiding arbitration with a non-signatory (here, TDS). First, it is necessary to determine whether "the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Doe v. Trump Corp.*, 6 F.4th 400, 412–13 (2d Cir. 2021) (quoting *Choctaw Generation Ltd. P'ship v. American Home Assurance Co.*, 271 F.3d 403, 406 (2d Cir. 2001)). In other words, the dispute must be related to the contract containing the arbitration clause. *See Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 361 (2d Cir. 2008) ("Indeed, if the dispute had not been related to the arbitration contract, even a dispute between the parties who contracted with one another to arbitrate . . . would not have been arbitrable.").

The second prong assesses the relationship between the non-signatory seeking to enforce the agreement and the counterparty that signed the agreement. *Doe v. Trump Corp.*, 6 F.4th at 412–13. "[T]here must be a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement." *Id.* The promise to arbitrate must be "reasonably seen on

the basis of the relationships among the parties as extending not only to [the] contractual counterparty, but also to [the] entity that was, or would predictably become, with [the signatory's] knowledge and consent, affiliated or associated with [the counterparty] in such a manner as to make it unfair to allow [the signatory] to avoid its commitment to arbitrate[.]" *Sokol*, 542 F.3d at 361. For example, the Second Circuit has found sufficient relationships between parties in cases involving parents and subsidiaries, as well as other corporate affiliate relationships. *See id.* at 359–60 (citing *JLM Indus., Inc. v. Stolt–Nielsen SA*, 387 F.3d 163 (2d Cir. 2004) and *Astra Oil Co., Inc. v. Rover Navigation, Ltd.*, 344 F.3d 276 (2d Cir. 2003)).[2]

Starting with the first prong of this two-part test, Austin argues that the issue he seeks to litigate, the enforceability of the Non-Compete, is not "intertwined" with the U4 because his claims do not rely on the U4. ECF No. 36 at 7. However, courts have adopted a broader view of what it means for claims to be intertwined with an agreement to arbitrate. In *Ragone*, the Second Circuit required arbitration with a non-signatory even though the arbitration agreement was not

[2] *Sokol's* description of other cases where equitable estoppel applied is instructive. For example, in discussing *Astra Oil*, the *Sokol* court explained: "[*Astra Oil*] was [a] shipping dispute involving closely affiliated companies[.] Rover Navigation [], an ocean carrier, had entered into a charter party with AOT Trading AG [], an affiliate of Astra Oil [], for carriage of AOT's cargo for consignment to Astra. The charter party, which contained an arbitration clause, was negotiated on AOT's behalf by Astra. When Rover failed to make timely delivery of the cargo, Astra and AOT jointly demanded that Rover arbitrate the dispute. Rover contested its obligation to arbitrate with Astra as Astra was not a signatory to the contract. We rejected Rover's argument and permitted Astra [] to enforce the arbitration clause against Rover [], emphasizing the close affiliation between AOT and Astra of which Rover had been aware by having dealt with and accepted instructions from Astra and AOT interchangeably, treating them effectively as the same entity." *Sokol*, 542 F.3d at 360.

"linked textually" to the plaintiff's claims. 595 F.3d at 127. The court cited the reasoning of its prior decision in *Ross v. American Express Co.*, 547 F.3d 137 (2d Cir. 2008), which described this first prong as addressing whether "the subject matter of the dispute between the parties" is related to the "subject matter" of the agreement to arbitrate. *Ragone* at 127–28 (citing *Ross* at 146). Similarly, in *Sokol Holdings v. BMB Munai*, the Second Circuit, after discussing several of its prior decisions, described the relevant inquiry as whether "the subject matter of the dispute was intertwined with the contract providing for arbitration." 542 F.3d at 361.

Here, the subject matter of the contract providing for arbitration, the U4, is extremely broad. It requires arbitration of *any dispute* between Austin and his firm (here, TDFP) "or any other person" that is required to be arbitrated under FINRA rules:

> I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of [FINRA] as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgment in any court of competent jurisdiction.

ECF No. 20-1 at 14. The FINRA rules, which are expressly referenced in this clause, require arbitration of any dispute between a Member and an Associated Person that arises out of their business activities. FINRA Rule 13200.[3] Thus, the

[3] FINRA Rule 13200(a) reads, "Except as otherwise provided in the Code, a dispute must be arbitrated under the Code if the dispute arises out of the business activities of a member or an associated person and is between or among: Members; Members and Associated Persons; or Associated Persons." The FINRA code defines a "Member" as, among other things, "any broker or dealer admitted to membership in FINRA." FINRA Rule 13100(q). It defines "Associated Person" to include "a natural person who is registered

subject matter of the agreement to arbitrate is, at the very least, any business-related dispute between Austin and TDFP. But the U4 arguably extends to business activities between Austin, as an "Associated Person" and TDS, as a "Member" of FINRA.[4]

Although Austin contends that his only dispute is with TDS, his claims are factually intertwined with the work he performed for TDFP, which were plainly business activities. As the First Amended Complaint explains, TDFP, which was headed by Matthew Schrager and Martin Mannion, was part of TDS's "integrated Global Fixed Income group" and developed "quantitative trading strategies" across a range of financial products. FAC at 6, ¶¶ 30, 31. In particular, TDFP ran "market-making strategy" within TDS. *Id.* at 6, ¶¶ 32, 35. Austin claims he was lured to leave his prior job through misrepresentations, including by Schrager, *see id.* at 3–5, ¶¶ 17–21, which led Austin to believe he would have direct oversight of existing trading strategies, including "market-making strategy," which was the domain of TDFP, and "the alpha strategy" he was to develop, *id.* at 5 ¶ 23. Austin

---

or has applied for registration under the Rule of FINRA" as well as "a person formerly associated with a member." FINRA Rule 13100(b), (u).

[4] Austin does not dispute that he is an Associated Person and that both TDFP and TDS are Members within the meaning of FINRA's rules. *See* FINRA Rule 13100 (b), (q), (u). Nor does he suggest that this dispute over the Non-Compete does not arise out of his "business activities" withing the meaning of FINRA Rule 13200. Indeed, courts have construed this rule broadly to include employment-related claims. *See Griffis v. Wells Fargo Advisors, LLC*, No. 13-CV-8372, 2014 WL 3027683, at *3 (N.D. Ill. July 3, 2014) ("The rule contains no express limitation on disputes arising before or after an associate person's term of employment with a member, and courts have construed Rule 13200 to require arbitration where a plaintiff's claims involve his hiring, employment, and termination.") (internal citation omitted).

then worked on a variety of projects to enhance this "market-making strategy [and] alpha strategy." *Id.* at 6, ¶ 36. However, the co-heads of TDFP allegedly took steps to terminate employees who were critical to executing Austin's alpha strategy, *id.* at 9, ¶ 63, and advised Austin that they would not force implementation of the alpha strategy, *id.* at 10, ¶ 67. Austin now contends that enforcement of the Non-Compete is unreasonable because he had only limited involvement in Defendant's trading businesses and thus poses no competitive risk to Defendant. *Id.* at 12–13, ¶¶ 95, 97.

The First Amended Complaint demonstrates that the subject matter of the dispute that TDS seeks to arbitrate includes the nature of the work that Austin performed for TDFP and whether TDFP's leadership tortiously interfered with Austin's employment plans. Even assuming a very narrow construction of the U4 (*i.e.*, that it is limited to disputes over business activities with TDFP, and does not apply directly to TDS), this dispute relates to TDFP's trading business and what measures TDFP's leadership can lawfully take to protect that trading business. The subject matter of this dispute is sufficiently intertwined with the subject matter of the U4, even construing the U4 narrowly, to satisfy the first prong of the test for equitable estoppel.[5]

---

[5] Austin cites *Metropolitan Life Insurance Co. v. Bucsek,* to argue that his claims regarding the Non-Compete are not subject to arbitration because the Non-Compete is "an agreement over which FINRA has no regulatory interest." ECF No. 36 at 7 (citing 919 F.3d 184, 192 (2d Cir. 2019)). But *Bucsek* was a case where an employee sought to compel arbitration based on events that occurred years after the plaintiff and MetLife had severed their ties with the NASD, which later merged into FINRA. 919 F.3d at 195. Here, TDS and TDFP were Members of FINRA throughout Plaintiff's employment. ECF No. 21 at 13–14. *Bucsek* does not stand for the proposition that FINRA has no regulatory interest in a

The second prong assesses the relationship between the non-signatory (TDS) and the signatory (TDFP). *Id.* Plaintiff's brief discussion of this second prong does not address this relationship in any detail. *See* ECF No. 36 at 7–8. Instead, Austin's primary argument is that he signed two separate agreements with two different legal entities, and "never agreed, explicitly or implicitly, that disputes with Defendant would be arbitrated."[6] *Id.* at 7. This argument fails to address the relevant question, which is whether the relationship between the two entities is such that it would be unfair not to extend the agreement to arbitrate to the non-signatory, as well. *Sokol*, 542 F.3d at 361. While Plaintiff describes TDS as a "third-party wrongdoer," that is not a fair characterization of the relationship between TDS and TDFP.[7] To the contrary, the First Amended Complaint describes TDFP as an affiliate and subsidiary of TDS. FAC at 6. While he asserts that he primarily worked for TDS, Austin also pleads that he worked on a variety of projects related to TDS's market making strategy, which was run by TDFP. *Id.* Moreover, two of the key individuals Plaintiff references throughout his complaint

---

non-compete agreement between a FINRA Member and a FINRA Associated Person. To the contrary, FINRA Rule 13200 suggests that FINRA does have such a regulatory interest.

[6] In fact, Austin agreed to abide by FINRA Rule 13200, which purports to subject to arbitration a broad variety of disputes between Austin, an Associated Person, and TDS, a Member.

[7] Plaintiff cites to *Doe v. Trump*, in which the "third-party wrongdoer" had no corporate relationship with the entity that was a signatory to the agreement, which is not the case here. 6 F.4th at 413. Indeed, the Second Circuit recognized that the cases where estoppel *had* been applied "tended to share a common feature in that the non-signatory party asserting estoppel has had some sort of corporate relationship to a signatory party; that is . . . cases involving subsidiaries, affiliates, agents, and other related business entities." *Id.*

are Schrager and Mannion, the "co-heads of electronic trading and officers of TDFP." *Id.* Schrager is identified as his manager on a human resources form, which also contains a code that, according to Defendant, indicates that Austin was assigned to work within TDFP while employed by TDS. ECF Nos. 30-3, 29 at 11–12. Finally, Defendant offers the email from TDS's compliance function which encouraged Plaintiff to register with FINRA using the U4. ECF No. 30-2 at 2. While Austin points out that he registered only with TDFP, and not with TDS, the fact that he did so at the behest of TDS confirms the close relationship between these two affiliated companies.[8]

The Second Circuit's decision in *Ragone* is instructive. In that case, defendant AVI hired plaintiff as a makeup artist primarily to work with one of its clients, ESPN. 595 F.3d at 127. Plaintiff signed an employment agreement with AVI, but not with ESPN. *Id.* at 119–20. When plaintiff sued both AVI and ESPN, ESPN sought to enforce the arbitration clause in her employment contract with AVI. *Id.* The Second Circuit found the relationship between AVI and ESPN sufficient to support equitable estoppel, explaining:

> It is plain that when Ragone was hired by AVI, she understood ESPN to be, to a considerable extent, her co-employer. As we have detailed above, Ragone asserts that she was hired by AVI as a make-up artist for one of its significant clients, Defendant ESPN. Specifically, she was hired to provide make-up artistry and other services to ESPN's Cold–Pizza talent. Further, while she reported to AVI management,

[8] The parties dispute whether Austin's job required registration with FINRA. *See* ECF No. 21 at 11; ECF No. 19 at 8. Even assuming, as Austin contends, that registration was not required, his voluntary decision to register and to list TDFP as his firm only demonstrates the close connection between TDS and TDFP.

> she was also required to follow the instructions and directives of ESPN talent and ESPN supervisors on the set. *Id.* at 127 (cleaned up).

Here, the facts show an even closer relationship between TDS and TDFP, which were effectively Plaintiff's co-employers. Austin's manager was the head of TDFP, his HR form indicates he worked within TDFP, and he worked on at least some projects related to TDFP. ECF Nos. 30-3, FAC at 6. Moreover, when TDS encouraged him to register with FINRA, he registered under TDFP. ECF No. 30-2 at 2. Additionally, unlike the defendants in *Ragone*, TDS and TDFP are corporate affiliates, which weighs in favor of finding a sufficient relationship to support equitable estoppel. FAC at 6; *Sokol*, 542 F.3d at 361; *Doe*, 6 F.4th at 413.

Accordingly, Defendant has shown that both prongs of the test for applying equitable estoppel are satisfied, and TDS can therefore enforce the arbitration agreement between Plaintiff and TDFP.

### B. The Arbitrability of This Dispute Has Not Been Delegated to An Arbitrator

While TDS can enforce the arbitration clause in the U4 as a non-signatory by operation of equitable estoppel, Defendant raises a separate question of who should determine whether this dispute falls within the agreement to arbitrate.[9] Defendant argues that the arbitrability of this dispute is a question for the arbitrator. ECF No. 29 at 4–8. Plaintiff counters that the question of arbitrability has not been delegated to the arbitrator and the Court should decide it. ECF No. 36 at 4–6.

---

[9] This issue was raised for the first time on reply, but Austin had an opportunity to address it in his sur-reply.

The Second Circuit recently confirmed that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so. The FAA provides that the issue of arbitrability should presumptively be resolved by the courts." *Davitashvili v. Grubhub Inc.*, 131 F.4th 109, 117 (2d Cir. 2025) (internal citation omitted). For there to be "clear and unmistakable evidence" that parties agreed to arbitrate arbitrability, there generally must be some provision explicitly delegating this issue to the arbitrator. *Id.*

In support of its position, Defendant cites *Contec Corp. v. Remote Solution, Co., Ltd.*, 398 F.3d 205 (2d Cir. 2005). In that case, the arbitration agreement incorporated Rule 7 of the AAA Commercial Arbitration Rules, which states, "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." *Id.* at 208. The Second Circuit held that such explicit incorporation of a rule empowering an arbitrator to decide arbitrability constituted clear and unmistakable evidence. *Id.*; *see also WTA Tour, Inc. v. Super Clam Ltd.*, 339 F. Supp. 3d 390, 402 (S.D.N.Y. 2018) (finding incorporation of the same AAA rule constitutes "clear and unmistakable evidence.").

Seeking to fit within *Contec*, Defendant argues that the U4 delegates arbitrability to the arbitrator because it incorporates FINRA Rule 13413, which states, "[t]he panel has the authority to interpret and determine the applicability of all provisions under the Code. Such interpretations are final and binding upon the

parties." ECF No. 29 at 6. Defendant cites *Alliance Bernstein Inv. Rsch. and Mgmt., Inc. v. Schaffran*, 445 F.3d 121, 127 (2d Cir. 2006), and *Metropolitan Life Insurance Co. v. Bucsek*, 919 F.3d 184, 194 (2d Cir. 2019), for the proposition that Rule 13413 requires the arbitration panel to decide issues of arbitrability. *Id.* at 7. However, these cases support a narrower proposition: a FINRA arbitrator decides questions of arbitrability when a dispute centers on interpreting a provision of the FINRA code.

In *Alliance Bernstein*, the Second Circuit assessed a similarly worded predecessor to FINRA Rule 13413, NASD Rule 10324. The panel explained: "[the defendant] suggests that all issues of arbitrability between an NASD member and an associated member must be decided in arbitration. *We reject the suggestion as overly broad*." 445 F.3d at 126 (emphasis added). Rather, the court interpreted the rule as requiring that an arbitrator decide the arbitrability of disputes concerning *interpretation of the Code*, and critically, in that case, "[t]he crux of the dispute as to arbitrability [concerned] the interpretation and applicability of a provision of the Code, namely, Rule 10201(b)." *Id.* at 127. Likewise, *Bucsek* later confirmed that the language of Rule 13413 is directed to disputes requiring interpretation of the FINRA Code. 919 F.3d at 195 ("The provision empowering arbitrators 'to interpret and determine the applicability of all provisions of the Code' makes clear that arbitrators do not lack authority to interpret the Code and determine the applicability of its provisions, but it does not suggest that this power belongs exclusively to arbitrators.").

While Defendant argues that the arbitrator "determines and interprets questions regarding the applicability of the FINRA Code," it fails to identify any provision of the FINRA Code that needs to be interpreted here. ECF No. 29 at 4. Moreover, Defendant does not point to anything like the language in *Contec* that could constitute "clear and unmistakable evidence" that the arbitrability of this claim should go to the arbitrator. 398 F.3d at 208 (finding that inclusion of language stating "the arbitrator shall have the power to rule on his or her own jurisdiction" constituted clear and unmistakable evidence that the arbitrator had been delegated issues of arbitrability under the agreement). Accordingly, Defendant has not identified clear and unmistakable evidence that the arbitrator has been delegated jurisdiction to determine the arbitrability of this dispute, and the Court must decide whether Plaintiff's claims are subject to arbitration.

**C. The U4 Agreement Covers This Dispute**

While the Court must decide the arbitrability of these claims, it is clear from the U4 that this dispute must proceed to arbitration. The U4 arbitration clause is remarkably broad, and the FINRA rule that it incorporates by reference is even broader. Read together, they cover "any dispute" between "Members" and "Associated Persons" arising out of their "business activities." ECF No. 20-1 at 14; FINRA Rule 13200. Defendant argued for this construction of the arbitration clause in its opening brief (*see* ECF No. 19 at 7–8, 15–17). Plaintiff's opposition offered no direct response.[10] For example, Austin does not dispute that he is an

---

[10] Instead, the opposition focused on two arguments, discussed in Section III.D below, that missed the point: (1) that the more specific forum selection clause overrides the

"Associated Person," that TDS is a "Member," or that he, as an Associated Person, has agreed to arbitrate all disputes with Members about business activities. *See* FINRA Rule 13100 (b), (q), (u). Austin simply fails to engage with Defendant's textual argument that, by signing the U4, Austin agreed to arbitrate disputes with TDS. Nor does he address Defendant's assertion that "business activities" has been construed broadly to cover employment disputes. *See* ECF No. 19 at 16 (citing *Griffis v. Wells Fargo Advisors, LLC*, No. 13-CV-8372, 2014 WL 3027683, at *3 (N.D. Ill. July 3, 2014) ("[C]ourts have construed Rule 13200 to require arbitration where a plaintiff's claims involve his hiring, employment, and termination.") (internal citation omitted)). He also makes no argument that the claims he brings regarding the Non-Compete do not constitute employment disputes. Therefore, under the terms of the U4 agreement and the incorporated provisions of the FINRA code, Austin's claims must proceed to arbitration.

### D. Plaintiff's Other Arguments Are Unpersuasive

#### 1. The Specific Controls the General

Plaintiff makes two arguments in opposition to the motion that are unpersuasive. These arguments were presented in Plaintiff's initial opposition brief, which failed to address the critical question of whether a non-signatory (TDS) can enforce an arbitration agreement against a signatory (Austin).

general arbitration agreement (*see* ECF No. 21 at 7–10) and (2) that a non-signatory cannot be bound to the arbitration agreement (*see* ECF No. 21 at 10–14).

First, Plaintiff argues that because the Non-Compete is the more specific agreement, it overrides the more general "default" agreement to arbitrate contained in the U4. ECF No. 21 at 7–8. Plaintiff cites several cases relying on *Applied Energetics, Inc. v. NewOak Cap Markets, LLC*, 645 F.3d 522 (2d Cir. 2011), for the rule governing when an agreement to adjudicate (*i.e.*, an agreement with a forum selection clause choosing certain courts) displaces a separate arbitration agreement.[11] In *Applied Energetics*, the Second Circuit addressed which of two agreements addressing the same transaction should apply to a dispute: the first agreement was entered into earlier in time and contained an arbitration clause, the second was entered into about a month later, and contained merger and forum selection clauses. 645 F.3d at 523–24. The Court explained that, "in deciding whether a contractual obligation to arbitrate exists, courts should generally apply state-law principles that govern the formation of contracts" and "[u]nder New York law, "[i]t is well established that a subsequent contract regarding the same matter will supersede the prior contract." *Id.* at 526. The relative timing of these agreements was essential to this holding. For example, the Court explained that "contracting parties are free to revoke an *earlier* agreement to arbitrate by executing a *subsequent* agreement the terms of which plainly preclude arbitration." *Id.* at 525 (emphasis added).

[11] *See e.g., Citigroup Glob. Markets Inc. v. All Children's Hosp., Inc.*, 5 F. Supp. 3d 537, 539 (S.D.N.Y. 2014); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Oliver*, 681 F. App'x 64, 66 (2d Cir. 2017); *Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*, 764 F.3d 210, 215 (2d Cir. 2014).

Indeed, in the cases Plaintiff cites in support of this argument, the more specific agreement that prevailed over a general agreement to arbitrate was entered into *after* the agreement to arbitrate. Plaintiff first cites *Citigroup Glob. Markets Inc. v. All Children's Hosp., Inc.*, which relied on *Applied Energetics*. 5 F. Supp. 3d at 539 ("The Court agrees . . . that the instant issue is governed by [*Applied Energetics*], which held that an agreement's merger clause and a forum-selection clause that required adjudication operated to displace a *previous or background* agreement to arbitrate.") (emphasis added). Next, he cites *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Oliver*, 681 F. App'x 64 (2d Cir. 2017), where the holding turned on the sequence of the competing contracts, as in *Applied Energetics*. 681 F. App'x 64, at 66 ("[W]here, as here, a party *initially* consents … to arbitrate certain types of claims, but *later* enters into a[n] … agreement that releases claims that had been subject to the *initial* consent to arbitrate, the claims that have been released by such a settlement are no longer subject to arbitration.") (emphasis added) (internal citation omitted).

Plaintiff's reliance on *Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.,* 764 F.3d 210 (2d Cir. 2014), is equally misplaced. As in *Oliver*, that Court assessed "whether an arbitration agreement remains in force in light of a *later-executed* agreement[.]" 764 F.3d at 215. Plaintiff identifies no case holding that an *earlier* agreement containing a forum selection clause can override a subsequent agreement to arbitrate disputes, which are the facts presented here.[12] Indeed, such

[12] The remaining cases Plaintiff cites to support his argument are also inapplicable. Austin cites both *Tchr. Ins. & Annuity Ass'n of Am. v. Adair*, No. 21-CV-10883, 2023 WL

a result would be contrary to well-established contract formation principles that a later agreement supersedes an earlier agreement on the same subject matter. Therefore, Plaintiff has failed to show how the earlier Non-Compete could supersede the subsequently signed U4.[13]

### 2. Binding Non-Signatories to An Agreement

Second, Plaintiff discusses several theories that can bind a *non-signatory* to an arbitration agreement and argues that Defendant cannot rely on any of them. ECF No. 21 at 10 ("New York law recognizes five theories under which non-signatories may be bound to the arbitration agreements of others: (i) incorporation by reference; (ii) assumption; (iii) agency; (iv) veil-piercing/alter ego; and (v) estoppel"). This argument is a straw man because these cases have no application here, where a *non-signatory* seeks to bind a *signatory* to an agreement.

---

2557390, at *12 (S.D.N.Y. Mar. 17, 2023) and *Credit Suisse Sec. (USA) LLC v. Tracy*, 812 F.3d 249 (2d Cir. 2016), for the proposition that "self-regulatory organizations' arbitration provisions are default rules that can be overcome by more specific contractual terms." *See* ECF No. 21 at 8. But the *Adair* Court made clear that its reasoning turned on the plaintiff's lack of FINRA membership or association, meaning there was no background or previous obligation to arbitrate under the FINRA rules. *Adair*, 2023 WL 2557390, at *6. While *Tracy* did not describe the precise sequence of the relevant agreements, the court relied on multiple decisions discussed above where timing was a significant factor. 812 F.3d at 255 (citing *Merrill Lynch*, 903 F.2d 109, and *Golden Empire*, 764 F.3d 210).

[13] Austin also argues that the forum selection clause coupled with the merger clause of the Non-Compete "overrides underlying arbitration rules." ECF No. 21 at 9. This argument fails for two reasons. First, it relies on *Applied Energetics* and *Citigroup*, which involved forum selection clauses superseding *earlier* arbitration agreements. 645 F.3d 522; 5 F. Supp. 3d 537. Second, the merger clause in the Non-Compete protects "the Company" from amendments, but does not extend similar protection to Austin. ECF No. 22-2 at 8. Thus, Austin identifies no provision of the Non-Compete that prevented him from overriding the forum selection clause by entering into the U4.

Plaintiff cites *Thomson-CSF, S.A. v. Am. Arb. Ass'n*, 64 F.3d 773 (2d Cir. 1995), where the Second Circuit assessed whether a *signatory* could compel arbitration with a *non-signatory*. The court explained that this scenario was materially different from the facts here, where a *non-signatory* seeks to compel a *signatory* to arbitrate:

> [T]he circuits have been willing to estop a signatory from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed. As the district court pointed out, however, [t]he situation here is inverse: E & S, as signatory, seeks to compel Thomson, a non-signatory. While E & S suggests that this is a non-distinction, the nature of arbitration makes it important. Arbitration is strictly a matter of contract; if the parties have not agreed to arbitrate, the courts have no authority to mandate that they do so.

64 F.3d at 779 (internal citation omitted). A later decision confirmed that cases addressing whether a signatory can compel a non-signatory to arbitrate are inapplicable to the inverse situation. *See Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.*, 271 F.3d 403, 406 (2d Cir. 2001) ("In [*Thomson*], this Court classified five theories, including estoppel, under which a signatory can compel a non-signatory to arbitrate—none of them applicable here because among other things in this case it is the non-signatory that seeks to invoke the arbitration clause.") (citation omitted). Accordingly, Plaintiff's reliance on these cases is misplaced.

## IV. CONCLUSION

For the reasons described above, the motion to compel arbitration is **GRANTED** and this case is stayed pending arbitration. The Clerk of Court is

respectfully directed to terminate the Motion at ECF No. 17 as **GRANTED** and to stay this matter.

**SO ORDERED.**

Dated: August 31, 2026
New York, New York

Henry J. Ricardo
United States Magistrate Judge